## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

1

2   **DAISY ANNETTE SANTIAGO**             *

3       **Plaintiff**                   *

4           **v.**                 *     **CASE NO.: 97-2737 (DRD)**

5   **OSVALDO RIOS ALONSO, et al**     *

6

7      **Defendants**              *

8   •   *   *   *   *   *   *

9

10                   **OPINION AND ORDER**

11       Before the Court is Defendant's Motion to Dismiss Plaintiff's Complaint for civil damages

12   on grounds of the unconstitutionality of the Civil Rights provisions of the Violence Against Women

13   Act of 1994, 42 U.S.C. § 13981 (Docket No. 58); and the United States' Motion to Intervene,

14   pursuant to 28 U.S.C. § 2403(a), in order to defend the constitutionality of said provisions. (Docket

15   No. 67).   Because the Court determines that section 13981 of the Violence Against Women Act

16   exceeds Congress' legislative scope under both the Commerce Clause and the Enforcement Clause

17   of the United States Constitution, Defendant's Motion to Dismiss is **GRANTED.**

18                     **INTRODUCTION**

19

20       Congress enacted the Violence Against Women Act of 1994 (hereinafter "VAWA") as a

21   response to increasing nationwide problems with domestic violence, sexual assault, and other forms

22   of violent crimes against women.   In enacting said statute, Congress specifically invoked its

23   legislative powers under the Commerce Clause and § 5 of the Fourteenth Amendment, 42 U.S.C.

24

25

26                    1

§ 13981(a), and created a federal substantive right "to be free from crimes of violence motivated by gender." 42 U.S.C. § 13981(b). Further, Congress provided victims of these crimes with a private cause of action for compensatory and punitive damages, injunctive relief and any other appropriate remedy against any person who commits a crime of violence motivated by gender. 42 U.S.C. 13981(b) & (c). The VAWA's self-stated purpose is "to protect the civil rights of victims of violence motivated by gender and to promote public safety, health and activities affecting interstate commerce by establishing a Federal civil rights cause of action for victims of crimes of violence motivated by gender." 42 U.S.C. § 13981(a).

Despite the VAWA's expressed purpose of promoting activities "affecting interstate commerce," Defendants request dismissal of Plaintiff's cause of action arguing that section 13981 exceeds the scope of Congress' authority under both the Commerce Clause and § 5 of the Fourteenth Amendment. In support for this position, Defendants invoke the Supreme Court's decision in U.S. v. López, 514 U.S. 567, 115 S.Ct. 1624 (1995), and the Fourth Circuit's decision in Brzonkala v. Virginia Polytechnic Institute, 169 F.3d 820 (4th Cir. 1999).[1] Briefly stated, these decisions hold that Congress' legislative power over activities that substantially affect interstate commerce is limited to the regulation of economic activities arising out of or having a connection with interstate commerce or to the regulation of non-economic activities as long as the regulating statute has a

---

[1] López declared that the Gun-Free School Zones Act of 1990 exceeded the bounds of Congress' power under the Commerce Clause because the Act neither regulated a commercial activity nor did it have a jurisdictional requirement that the specific incident under scrutiny have a connection with interstate commerce. Brzonkala applied López to section 13981 and found that Congress had exceeded its legislative scope both under the Commerce Clause and the Fourteenth Amendment. Brzonkala is now under consideration by the United States Supreme Court. Oral arguments were heard on Tuesday, January 12, 2000.

2

jurisdictional requirement that the specific incident at issue is somehow linked to interstate commerce. Further, Brzonkala holds that section 13981 is not a valid exercise under the Fourteenth Amendment because section 13981 is addressed exclusively at private action, hence the state action requirement of the Equal Protection Clause is not met.

The United States intervened to join Plaintiff in defending section 13981. The main argument advanced was that Brzonkala's reading of López is far too narrow and is inconsistent with judicial precedent that establishes the constitutional requirements of the Commerce and Equal Protection Clauses. Further, the United States argued that section 13981 is an appropriate exercise of Congress' power to regulate interstate commerce because violence against women is a widespread social problem with ultimate effects on the national economy; and under the Fourteenth Amendment because bias and discrimination against women in the state criminal justice systems often deny legal redress to the victims of gender-motivated crimes of violence.

## COMMERCE CLAUSE

### I. Background

In López the Supreme Court discussed the development of Commerce Clause jurisprudence explaining that after many years of developing this body of law in the mid 1900's the Court "ushered into an era that greatly expanded the previously defined authority of Congress under that Clause." 514 U.S. at 556, 115 S.Ct. at 1628. First, in NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615 (19937), the Court upheld the National Labor Relations Act against a Commerce Clause challenge and held that intrastate activities that "have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions" are within Congress' power to regulate. Id. at 37, 57 S.Ct. at 624. Later,

3

in <u>Wickard v. Filburn</u>, 317 U.S. 111, 63 S.Ct. 82 (1942), the Court upheld the application of amendments to the Agricultural Adjustment Act of 1938 to the production and consumption of homegrown wheat and stated that "even if an appellee's activity be local and though it may not be regarded as commerce, it may still, whatever, its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce..." <u>Id.</u> at 125, 63 S.Ct. at 89.

According to <u>López</u>, the expansion in the Supreme Court's view of congressional power under the Commerce Clause was due, at least in part, to the Court's "recognition of the great changes that occurred in the way business was carried out in this country. Enterprises that had once been local or at most regional in nature had become national in scope." 514 U.S. at 556, 115 S.Ct. at 1628. But these expansive changes were also due to the Court's view "that earlier Commerce Clause cases artificially had constrained the authority of Congress to regulate interstate commerce." <u>Id.</u> Thus followed an era in which the Court upheld a wide variety of congressional Acts regulating intrastate economic activity which the Court concluded had a substantial effect on interstate commerce. <u>See Id.</u> at 559-560, 115 S.Ct. at 1630.

Despite the above, the <u>López</u> court made clear that even those cases which greatly expanded Congress' power under the Commerce Clause had recognized that congressional power was subject to outer limits. For example, in <u>Jones</u> the Court warned that the scope of Congress' Commerce Clause power had to be "considered in light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." 301 U.S. at 37, 57 S.Ct. 624. Accordingly, since the time when those expanding decisions where reached, the Supreme Court

4

has "heeded that warning and undertaken to decide whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce." López, 514 U.S. at 558, 115 S.Ct. at 1629. Further, even those expansive cases explicitly stated that the Court had not "declared that Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities." Wickard, 317 U.S. at 197, n. 27, 63 S.Ct. at 89-90, n. 27. Rather, "[t]he Court has said only that where a *general regulatory statute bears a substantial relation to commerce,* the *de minimis* character of individual instances arising under that statute is of no consequence." Id. (Emphasis added by López, 514 U.S. at 558, 115 S.Ct. at 1629).

Following the above doctrine, the López court identified three broad areas that Congress has been allowed to regulate under the Commerce Clause.

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.

U.S. v. López, 514 U.S. 549, 558-559, 115 S.Ct. 1624, 1629 (1995) (citations omitted). See also: U.S. v. Henson, 123 F.3d 1226, 1232 (9th Cir. 1997); U.S. v. Knutson, 113 F.3d 27, 29 (5th Cir. 1997); U.S. v. Kim, 94 F.3d 1247, 1249 (9th Cir. 1996); U.S. v. Lerebours, 87 F.3d 582, 584-85 (1st Cir. 1996); U.S. v. Wilson, 73 F.3d 675, 685 (7th Cir. 1995); U.S. v. Salmiento, 898 F.Supp. 45, 46 (D.P.R. 1995), affirmed at U.S. v. Zorilla, 93 F.3d 7 (1st Cir. 1996).

Like in López, the first two of the above categories are irrelevant to the case at bar, since the VAWA "is not a regulation of the use of the channels or interstate commerce, nor is it an attempt to prohibit the interstate transportation of a commodity through the channels of commerce; nor can

5

[the VAWA] be justified as a regulation [protecting] an instrumentality of interstate commerce or a thing in interstate commerce." 514 U.S. at 559, 115 S.Ct. at 1630. Therefore, like in López, "if [the VAWA] is to be sustained, it must be under the third category as a regulation of an activity that substantially affects interstate commerce." Id.

**II. Regulation of an activity that substantially affects interstate commerce**

When considering the constitutionality of a statute that falls within the third category of activities that may be regulated under the Commerce Clause, "the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." Id. A statute challenged under the Commerce Clause will be upheld if it is "an essential part of a larger regulation of economic activity, in which the regulatory scheme would be undercut unless the intrastate activity were regulated." Id. at 561, 115 S.Ct. at 1631. That is, the statute is constitutional if it involves the "regulation of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." Id. On the alternative, if the statute does not regulate an activity that arises out of or is connected to a commercial transaction, the statute will nonetheless be upheld if it contains a "jurisdictional element which would ensure, through case-by-case inquiry, that the [gender-motivated crime of violence] in question affects interstate commerce." Id.

Like the statute in López, section 13981 does not contain a jurisdictional element to ensure that the specific incident of gender-motivated violence in question affects interstate commerce. Wherefore, the Court's discussion will focus on the first alternative, whether section 13981 regulates an activity that arises out of or is connected to a commercial transaction which viewed in the aggregate substantially affects interstate commerce.

6

While making an independent evaluation of the constitutionality of a statute under the alternative of an activity arising out of or connected to a commercial transaction, courts will, of course, consider congressional findings regarding a statute's effect on interstate commerce. Id. at 562, 115 S.Ct. at 1631. Indeed, the López court explicitly acknowledged that congressional findings may enable courts to "evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye." Id. at 563, 115 S.Ct. at 1632. Thus, where Congress has made a specific finding that a regulated activity has a substantial effect on interstate commerce, the Supreme Court has said that courts must defer to the congressional finding so long as Congress had a rational basis to sustain that determination. Id. at 557, 115 S.Ct. at 1629. See also Hodel v. VA Surface Mining and Reclamation Ass'n, 452 U.S. 264, 276, 101 S.Ct. 2352, 2360 (1981); Timm v Delong, 59 F.Supp. 2d 944, 951 (D.Neb. 1998); Proyect v. U.S., 101 F.3d 11, 12-13 (2nd Cir. 1996); U.S. v. McKinney, 98 F.3d 974, 979 (7th Cir. 1996). Notwithstanding, whether an activity affects interstate commerce sufficiently so as to be regulated under the commerce clause "is ultimately a judicial rather than a legislative question." López, 514 U.S. at 558, n. 2, 115 S.Ct. at 1629, n. 2. See also Brzonkala, 169 F.3d at 845-850; Heart of Atlanta Motel, Inc. v. U.S., 379 U.S. 241, 273, 85 S.Ct. 348, 366 (1964).

The government argues that section 13981 is supported by numerous congressional findings that gender-motivated crimes substantially effect interstate commerce. This case, therefore, is distinguishable from López, where the Court did not have any congressional findings whatsoever. Consequently, the government avers, in evaluating the constitutionality of section 13981 the court does not have to "pile inference upon inference" in order to conclude whether or not gender-motivated violent crimes have a substantial impact on interstate commerce. See Id. at 567. 115

7

S.Ct. at 1634. On the contrary, the Court can defer to Congress' findings and find a substantial effect between gender-motivated crimes and interstate commerce.

Undoubtedly, after four years of congressional hearings and investigations Congress explicitly concluded that gender-motivated crimes of violence substantially effect interstate commerce. Congress explicitly found that:

> [C]rimes of violence motivated by gender have a substantial adverse effect on interstate commerce, by deterring potential victims from traveling interstate, from engaging in employment business, and from transacting with business, and in places involved, in interstate commerce; crimes of violence motivated by gender have a substantial adverse effect on interstate commerce, by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and demand for interstate products.

See H.R. Conf. Rep. No. 103-711 at 385. See also: S. Rep. No. 102-197 at 38; S. Rep. 102-197 at 53; S. Rep. No. 103-138 at 41; S. Rep. No. 101-545 at 33.

Congress also openly evaluated whether or not section 13981 met the Commerce Clause requirements and surmised that:

> Gender-based violent crimes meet the modest threshold required by the Commerce Clause.  Gender-based crimes and the fear of gender-based crimes restricts movement, reduces employment opportunities, increases health expenditures, and reduces consumer spending, all of which affect interstate commerce and the national economy.  Gender-based violence bars its most likely targets –women– from full participation in the national economy. For example, studies report that 50 percent of rape victims lose their jobs or are forced to quit in the aftermath of the crime.  Even the fear of gender-based violence affects the economy because it deters women from taking jobs in certain areas or at certain hours that pose a significant risk of such violence.

See S. Rep. No. 103-138, at 54 n. 70 (1993).

Albeit, this Court cannot blindly accept Congress' findings as "conclusive." López, 514 U.S. at 557, 115 S.Ct. at 1624.  Instead, the Court must undertake an "independent evaluation" and

8

determine whether, as a legal matter, section 13981 satisfies the "substantially affects" test. ("'Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not make it so.' Rather, because the question of whether particular activities 'affect sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question,' we cannot sustain a statute solely on the strength of a congressional finding as to the factual relationship between a particular activity and interstate commerce. Instead, we must undertake an 'independent evaluation' to determine whether, as a legal matter, the substantially affects test is satisfied." Brzonkala, 169 F.3d at 845 (citations to López omitted)).

The Court determines that section 13981 suffers from the same fatal deficiencies as the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922 (q). The Court explains. As the Gun-Free School Zones Act in López, this Court finds that section 13981 is an attempt to "convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States," 514 U.S. at 567, 115 S.Ct. at 1634. Further, despite what Congress has stated, section 13981 neither regulates an activity arising out of or related to a commercial activity,[2] nor does it contain a

---

[2] As was discussed by the Fourth Circuit in Brzonkala, section 13981 does not regulate economic activity:

> The statute does not regulate the manufacture, transport, or sale of goods, the provision of services, or any other sort of commercial transaction. Rather, it regulates violent crime motivated by gender animus. Not only is such conduct not commercial, it is not even economic in any meaningful sense... [Further,] [t]hat section 13981 may, on occasion, reach activity that arises in part from economic motives does not transform it into a statute regulating economic activity. [...]

> Not only is violent crime motivated by gender animus not even arguably commercial or economic, it also lacks a meaningful connection with any particular, identifiable economic enterprise or transaction. Furthermore, unlike guns in school zones, violence arising from gender animus lacks even a meaningful connection with

jurisdictional element that will ensure that the specific gender-motivated crime at issue is connected in any way to interstate commerce.[3]   Rather, section 13981 regulates an activity that, at most, has an attenuated and indirect connection with interstate commerce.  See Brzonkala, 169 F.3d at 851-852.  And finally, even if López was read as allowing Congress to regulate noneconomic activity absent jurisdictional elements, section 13981 still cannot be upheld as a constitutional exercise of legislative power.  As stated in Brzonkala:

> [...] López affirms that we must evaluate carefully the implications of our holdings upon our federal system of government and that we may not find an activity sufficiently related to interstate commerce to satisfy the substantially affects test in reliance upon arguments which, if accepted, would eliminate all limits on federal power and leave us 'hard pressed to posit any activity by an individual that Congress is without power to regulate.'  This is so especially when the regulated activity falls within an area of the law 'where States historically have been sovereign, and
> 
> _____
> 
> any specific activity that might arguably be considered economic or commercial in the loosest sense.
>    Finally, section 13981 cannot be sustained as 'an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the interstate activity would were regulated.'  Although section 13981 addresses private discrimination, and other laws address discrimination in clearly economic contexts, the federal patchwork of antidiscrimination laws can hardly be characterized as a single, interdependent regulatory scheme aimed at commercial or economic activity.  While such an understanding of section 13981 might be suggested by certain language in the committee reports, section 13981 and Title VII – the statute to which the report apparently refers – cannot reasonably be said to constitute a unified statutory scheme.  While the two statutes share a general concern with discrimination, they address different kinds of conduct that only occasionally overlap – gender-motivated violence on the one hand, employer discrimination on the other.  Rather than creating an integrated regulatory scheme, each statute is obviously written without regard for the concerns that animate the other.

Id. at 834-835.  (Citations omitted).

_____
[3]Although the criminal statutes enacted by Congress as part of the VAWA predicate liability on the crossing of state lines or leaving of Indian country, section 13981 includes no explicit or implicit jurisdictional requirement. Rather, section 13981 extends "to all persons within the United States" who are victims of gender-motivated violent crimes.

10

countenance of the asserted federal power would blur 'the boundaries between the spheres of federal and state authority' and obscure 'political responsibility.'

López, therefore, is emphatic that the scope of the interstate commerce power 'must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government.

Brzonkala, 169 F.3d at 837. (Citations omitted).

As in López and Brzonkala, the government's position relies on the "costs of violent crime" and on decreased "national productivity", both of which ultimately affect the national economy and, presumably, interstate commerce.  But as in López and Brzonkala, an attenuated link to interstate commerce is not sufficient to meet the "substantial effects" test:

We pause to consider the implications of the Government's arguments.   The Government admits, under its 'costs of crime' reasoning, that Congress would regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they related to interstate commerce. Similarly, under the Government's 'national productivity' reasoning, Congress could regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example.   Under the theories that the Government presents in support of [section 13981], it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign. Thus, if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate.

López, 514 U.S. at 564, 115 S.Ct. at 1632, as cited in Brzonkala, 169 F.3d at 838.

Further, "to the extent violence motivated by gender animus affects interstate commerce, it does so only in the same way that any other significant problem does.  Like violence in schools, violent crime generally, and many other less visible though still significant problems, violent crime motivated by gender animus undoubtedly imposes costs on, and decreases the productivity of its

11

victims.  As with other such problems, to the extent violent crime motivated by gender animus is widespread, these costs and productivity losses in the aggregate will ultimately, though indirectly, affect national economy.   And presumably, any adverse effect on the national economy will eventually also affect interstate commerce."  Brzonkala, 169 F.3d at 838 (citations omitted). Still, allowing Congress to legislate on the basis of such an attenuated link with interstate commerce "would be effectively to remove all limits on federal authority, and to render unto Congress a police power impermissible under our Constitution."  Id. at 840.

Consider, for example, that if the Government's arguments were to ultimately prevail, Congress would be able to regulate any significant activity, regardless of the level of intrusion into areas of the law traditionally delegated to the States.[4]  First,  although section 13981 does not duplicate or override criminal or intentional tort state laws, section 13981 does allow the federal government to encroach upon the States' ability to determine when and how violent crime will be punished and victims will be compensated. Id. at 841-842.  Second, though domestic violence is not in itself an object of family law, an area of the law that clearly has been left to the States' authority, issues of domestic violence do give rise to issues such as divorce and child custody.  Because of this, section 13981 "could involve the federal courts in a whole host of domestic relations disputes."  Id. at 842 (citation omitted).   Third, section 13981 sharply curtails the State's responsibility for regulating relationships between family members by abrogating interspousal and intrafamily tort

---

[4]Puerto Rico has, for example, legislated in the area of violence against women. Specifically, see Puerto Rico's laws creating the crimes of rape, P.R. Laws Ann. tit. 33 § 4061 (1983); lascivious acts, P.R. Laws Ann. tit. 33 § 4067 (1983); attempted homicide, P.R. Laws Ann. tit. 33 § § 3121 and 4004 (1983); aggravated restriction of liberty, 33 P.R. Laws Ann. tit. 33 § 4172 (1983).  See also Articles 3.1 and 3.2 of Puerto Rico's Domestic Violence Law, 1989, P.R. Laws No. 54, P.R. Laws Ann. tit. 8, § 601 et seq.

12

immunities, the marital rape exemption, and other related defenses that States may have chosen to provide by virtue of the nexus that may exist between an aggressor and his or her victim. Id. at 843. Thus, to uphold section 13981 under the Commerce Clause would be to extend federal control to a vast range of matters falling within the most traditional areas of state control. Fourth, although section 13981 is a "civil rights" statute, and as such, section 13981 should arguably be upheld under the same principles as other civil rights statutes, section 13981 does not target the discriminatory state denial of equal protection that is the concern of other civil rights statutes which have been upheld. In fact, section 13981 does not even regulate state conduct, nor does Congress ever suggest that section 13981 is aimed at addressing the results of the States' intentional, and, thus, unconstitutional, discrimination. Rather, section 13981 is purportedly aimed at providing a remedy for women who have not been able to receive a proper remedy because of "the failure, despite 'fervent' and 'sincere' efforts, to eradicate the 'subtle prejudices' and 'stereotypes' that prevent the victims of gender-motivated crimes from obtaining legal vindication in the state courts." Id. at 852.

In sum, this Court defers to Brzonkala's statement that:

> If we were to hold that a statute like section 13981, which regulates purely private, noneconomic activity at the very core of traditional state concern and has only the most attenuated relation to interstate commerce, could nonetheless be sustained under the Commerce Clause based upon no more than the kind of generalized findings of state shortcomings made here, then Congress could circumvent the constitutional limits on federal power imposed by both the Commerce Clause and the Fourteenth Amendment and claim a general police power, because charges that States have failed fully to eradicate or remedy bias can be made about nearly every area of traditional state concern.

Id. at 853 (citations omitted).

Admittedly, there are many decisions which have found section 13981 to be a constitutional congressional exercise under the Commerce Clause, Kuhn v. Kuhn, 1999 WL 519326 (N.D.Ill.

13

1999); Ericson v. Syracuse University, 45 F.Supp.2d 344 (S.D.N.Y. 1999); Doe v. Mercer, 37 F.Supp.2d 64 (D.Mass. 1999); and Timm v. Delong, 59 F.Supp.944 (D.Neb. 1998), and only one other decision that has held section 13981 unconstitutional, Bergeron v.Bergeron, 48 F.Supp.2d 628 (M.D. La. 1999). Further, of those decisions which held section 13981 unconstitutional, three expressly considered and rejected the Fourth Circuit's holding in Brzonkala. See Ericson, Doe, and Kuhn. These Courts held that Brzonkala gave López to narrow a reading and that the López decision relied primarily on the absence of congressional findings and, thus, the holding in López is inapplicable to section 13981. As stated previously, however, this Court does not agree with such a narrow reading of López and instead follows the precedent established by the Fourth Circuit in Brzonkala. Further, the Court concludes that Congress' findings in enacting section 13981 are no more than "generalized conclusions" which are the "functional equivalent" of the "costs of crimes" and "decreased national productivity" arguments were rejected by the Supreme Court in López. "While the data set forth in the legislative history clearly shows that gender-motivated violence against women is a serious problem (resulting in increased medical and other costs and decreased mobility and productivity of women  generally and in the workplace), the same could be said about crime in general. If the data showing 'costs of crimes' and 'decreased national productivity' provides a rational basis for finding that the substantially affects test has been met, then there is no outer limit to congressional authority under the Commerce Clause." Bergeron, 48 F.Supp.2d at 637-638.

**III. Commerce Clause conclusion**

For all the reasons stated above, this Court holds that section 13981 is not a valid exercise of congressional power under the Commerce Clause. Section 13981 neither regulates an activity that arises out of or has a connection with interstate commerce, nor does section 13981 have a

14

jurisdictional requirement that the specific incident at question is connected to interstate commerce. Thus, section 13981 does not meet the Commerce Clause's "substantially affects" test.

## EQUAL PROTECTION

The Court now turns to the Government's and Plaintiff's alternative assertion that section 13981 is a valid exercise of congressional power under the Enforcement Clause of the Fourteenth Amendment. Section V of the Fourteenth Amendment provides that "Congress shall have the power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, § 5. Thus, the Enforcement Clause provides a mechanism by which Congress may enact legislation to enforce other aspects of the Fourteenth Amendment, including laws necessary and proper to guarantee to all persons the equal protection of the laws. Timm, 59 F.Supp.2d at 958.

Specifically, and contrary to the general understanding that private action is beyond the scope of Congress' legislative power under the Equal Protection Clause, the Enforcement Clause has been broadly construed as "giving Congress the power to legislate remedies for state deprivations of equal protection, even if the activities regulated constitute private conduct, and, therefore, would not independently qualify as state action under section 1 of the Fourteenth Amendment." Id., citing City of Richmond v. J.A.Croson, 488 U.S. 469, 490, 109 S.Ct. 706, 720 (1989); District of Columbia v. Carter, 409 U.S. 418, 423-34 & 424 n. 8, 93 S.Ct. 602, 606 & n.8 (1973); U.S. v. Bledsoe, 728 F.2d 1094, 1097 (8th Cir. 1971).[5]

Notwithstanding, Congress' power to regulate purely private conduct under the Enforcement

---

[5]The Enforcement Clause has also been interpreted as "a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." Id., citing Katzenback v. Morgan, 384 U.S.641, 651, 86 S.Ct. 1717, 1723-1724 (1966).

15

Clause is not unbridled.[6] "[S]tatutes enacted pursuant to Section Five must be remedial in nature," meaning "that Congress has the power to make effective the substantive prohibitions against the states and state actors." Bergeron, 48 F.Supp.2d at 638. In fact, the Supreme Court in City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157 (1997), reaffirmed that Section Five does "not authorize Congress to pass 'general legislation upon the rights of the citizen, but corrective legislation; that is, such as may be  necessary and proper for counteracting such laws as the states may adopt or enforce, and which, by amendment, they are prohibited from making or enforcing.'" Id. at 566, 117 S.Ct. at 2166 (citations omitted).

Additionally, before Congress may regulate purely private conduct, Congress must make an "individualized showing of unconstitutional state action." Brzonkala, 169 F.3d at 862. That is, Congress must have "regard to whether the State adequately enforced its applicable criminal or civil laws." Id. at 869. Congress must then determine that the regulation at issue will serve as a remedy to said unconstitutionality. And as a remedy, Congress must ensure that the regulation is "closely

---

[6]Even Timm recognizes Congress' limited power in regulating purely private conduct under the Fourteenth Amendment's Enforcement Clause:

Although these line of cases suggests that state inaction may constitute state action for purposes of the Fourteenth Amendment, the Fourteenth Amendment conveys congressional authority over private conduct only where state action/inaction bears some relation to the private conduct.

The wrongful act of an individual, unsupported by such authority, is simply a private wrong, or a crime of that individual; an invasion of the rights of the injured party, it is true, whether they affect his person, his property, or his reputation; but if not sanctioned in some way by the state, or not done under state authority, his rights remain in full force, and may presumably be vindicated by resort to the laws of the state for redress.

The Civil Rights Cases, 109 U.S. at 17, 3 S.Ct. at 25-26.
Timm, 59 F.Supp.2d at 958.

16

tailored" to correct such violations, Id. at 874, and not "so out of proportion to the remedial

objective" that it cannot be "understood as responsive to, or designed to prevent, unconstitutional

behavior." City of Boerne, 521 U.S. at 532 , 117 S.Ct. at 2170. See also Brzonkala, 169 F.3d at

887-888; and Bergeron, 48 F.Supp.2d at 639.

It is undisputed that Section 13981 regulates purely private conduct by providing a civil

rights remedy against any person who commits a crime of violence motivated by gender.  The

Government, however, argues that section 13981 is "plainly adapted" to remedy unconstitutional

state action and to overcome any apparent State sanctioning of unlawful acts by private individuals.

Simply expressed, the Government argues that bias and discrimination in state criminal justice

systems often deprive victims of violent crimes motivated by gender from equal protection of the

laws and state inaction in this area results in the silent approval of the unlawful private conduct of

those who commit violent crimes motivated by gender.  Therefore, as expressed by Timm, "by

providing women with an alternative forum in which to seek justice for these unlawful actions,

Congress acted to address a legitimate equal protection concern. Thus, VAWA ensures women a

federal remedy if they are subjected to gender-motivated violence, violence which infringes upon

their right to equal protection secured by the Fourteenth Amendment." 59 F.Supp.2d at 961.

Convincing as the Government's arguments and the decision in Timm may sound, this Court

respectfully disagrees.  Section 13981 is not a valid congressional exercise under the Fourteenth

Amendment's Enforcement Clause.  Section 13981 is neither aimed at State conduct in violation of

the Equal Protection Clause nor is it "closely tailored" to correct such violations even though

regulating private conduct. Instead, section 13981 is "so out of proportion to the remedial objective"

that, like the statute in City of Boerne, section 13981 cannot be "understood as responsive to, or

17

designed to prevent, unconstitutional behavior." 521 U.S. at 532, 117 S.Ct. at 2170. See also Brzonkala, 169 F.3d at 887-888; and Bergeron, 48 F.Supp.2d at 639. The Court explains.

Section 13981 regulates private conduct independently of state action. Liability in section 13981 is not limited to States, to their officials, to those acting under color of state law, or to those that actively conspire or connive with state officials. Instead, section 13981 declares that certain acts committed by private individuals are offenses actionable under federal law, "without regard to whether the State connived in those acts or otherwise violated the particular plaintiff's constitutional rights." Brzonkala, 169 F.3d at 862. See also Id. at 869-870. Section 13981 "is not legislation designed to 'correct [] the effects of such prohibited State laws and State acts, and thus to render them effectually null, void, and innocous,' but rather [section 13981] is 'primary and direct' legislation that 'takes immediate and absolute possession of the subject of' individual acts of violence." Id. at 870, citing Civil Rights Cases, 109 U.S 3, 11, 3 S.Ct. 18 (1883). "[S]uch private conduct can *never* violate Section 1 of the Fourteenth Amendment." Brzonkala, 169 F.3d at 874 (emphasis on original).

Admittedly, one need not be too creative to argue that section 13981 is an effort to enforce the Equal Protection Clause by providing a remedy to sex discrimination in the enforcement of state criminal laws. Indeed, this is exactly what Congress concluded: "that bias and discrimination in the criminal justice systems [of the States] often deprives victims of crimes of violence motivated by gender of equal protection of the laws and the redress to which they are entitled" and that section 13981 is "necessary to guarantee equal protection of the laws." H.R. Conf. Rep. No. 103-711 at 385, as cited by Brzonkala, 169 F.3d at 881. Nonetheless, this Court cannot simply defer and consequently rubber stamp Congress' findings and conclusions. The Court must make an

18

independent judgment of section 13981's constitutionality, Id., and declare unconstitutional any Act that exceeds the limits to Congress' legislative powers. Furthermore, the Court must do so "even at the expense of invalidating laudable and otherwise socially beneficial legislation." Id. at 883.

In making this independent evaluation, the Court follows Brzonkala and finds that section 13981 cannot be upheld under the Fourteenth Amendment. First, Congress did not properly support its legal conclusion that "bias and discrimination [...] often deprives victims [...] of equal protection of the laws and the redress to which they are entitled." Id. Second, Congress incorrectly found that purely private acts of violence against women "threaten women's equal protection of the laws." Id. Third, Congress did not enact section 13981 out of a concern "with the type of *purposeful* [unconstitutional] discrimination against women in the enforcement of facially neutral laws that could give rise to an equal protection violation." Id. (emphasis in original). Instead, section 13981's legislative history "clearly demonstrates that section 13981 was not so much to redress violations of Equal Protection, but rather to send a national signal about the harms of violence against women." Id.[7] Although this is a commendable and noble purpose, and undoubtedly a "laudable and otherwise socially beneficial" legislation, Brzonkala, 169 F.3d at 883, this is not a constitutional purpose when devoid of any legitimate connection with state action.

Furthermore, even if section 13981 were a valid remedy to state discrimination, section 13981 lacks proportion to its alleged remedial purpose. Section 13981 imposes liability without

_____

[7]This conclusion is further supported by the fact that the VAWA does not contain any provisions regulating, remedying or correcting the alleged State conduct that the VAWA attempts to address. Additionally, section 13981 confers concurrent jurisdiction on State courts, thus belying Congress' concern with the bias and discrimination allegedly controlling the State criminal justice systems.

19

requiring a previous finding that the plaintiff has suffered some form of state discrimination in the prosecution of her claim and/or without finding that the victim's State has failed to provide a legal remedy to her injury.   This sweeping remedy is certainly not "closely tailored" to its purpose. Therefore, even if section 13981 were truly intended to remedy equal protection violations, the remedy created by section 13981 is out of proportion to any possible inequality in treatment. Accordingly, this Court concludes that section 13981 exceeds the scope of Congress' legislative authority and cannot be upheld under the Enforcement Clause of the Fourteenth Amendment.

## CONCLUSION

Even affording section 13981 the full presumption of constitutionality due to Acts by Congress, the Court holds that section 13981 is an excessive congressional exercise under both the Commerce Clause and the Enforcement Clause.   The Court, thus, declares section 13981 unconstitutional.  Plaintiff's cause of action under the VAWA is **DISMISSED** for failure to state a cause of action.[8]

**IT IS SO ORDERED.**

Date:  May _9_ , 2000

**DANIEL R. DOMINGUEZ**
**U.S. DISTRICT JUDGE**

---

[8]The Court is conscious that the constitutionality of VAWA is currently before the Supreme Court. (See footnote number 1). This Court is of the opinion that the statute will fail, decision which is expected by the end of the current Supreme Court term. Notwithstanding, should the Supreme Court uphold the statute while an appeal is pending in the instant case, relief will be available. Plaintiffs are forewarned, however, that an appeal must be taken in order for said relief to be provided, since Fed. R. Civ. Proc. 60 (b)(6) is not available once final judgment has been rendered. See Bailey v. Ryan Stevedoring Co., Inc., 894 F.2d 157 (5th Cir. 1990); Title v. U. S., 263 F.2D 28 (9th Cir. 1959); Class v. Norton, 376 F.Supp. 503 (D.C.Conn.1974).

20

AO 72
(Rev 8/82)